J-S78044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF C.T.C. AND K.C.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.D.C., II | No. 898 WDA 2016 |

Appeal from the Order May 16, 2016
in the Court of Common Pleas of Allegheny County Orphans' Court
at No(s): No. A-15-110

BEFORE: BENDER, P.J.E., OTT, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:                **FILED DECEMBER 14, 2016**

C.D.C., II ("Father") appeals from the order entered in the Allegheny County Court of Common Pleas granting the petition filed by his former girlfriend, J.A. ("Mother"), seeking termination of his parental rights to their sons, C.T.C. (born in July of 2005), and K.C.C. (born in February of 2008) (collectively, "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), and (b), so that Mother's husband, R.M.A. ("Stepfather"), may adopt the children. We affirm.

On October 26, 2015, Mother filed a petition for involuntary termination of Father's parental rights to Children, and Stepfather filed a petition for adoption seeking to adopt Children. On January 29, 2016, the trial court appointed Colleen A. Jeffry, Esq., as counsel for Father, who had recently been released from prison, and Margaret Gold, Esq., as Children's Guardian *Ad Litem* ("GAL"). Attorney Gold filed a GAL report on March 28,

---

[*] Former Justice specially assigned to the Superior Court.

2016, in which she summarized her interviews with all interested parties and recommended the termination of Father's paternal rights.

On May 16, 2016, the trial court held an evidentiary hearing on the termination petition. Mother and Stepfather testified and were present in the courtroom, while Father and his sister, J.S. ("Paternal Aunt"), testified via video conferencing. The trial court summarized the testimony as follows:

> Mother testified that at the time of [C.T.C.'s] birth [in July of 2005], she and Father had been involved in a relationship for approximately two years. They began residing together in Milwaukee, WI[,] after [C.T.C.'s] birth. Both parents were involved in the child's care. [K.C.C.] was born [in February of 2008]. Father moved from their shared residence a few months later. Mother believed that Father was abusing prescription narcotics. Initially, the parties had an equally shared custody arrangement. (N.T. 05/16/16, pp. 4-8).
>
> In late 2010, Mother filed the original custody action in Milwaukee County, WI[,] due to Father's increasing drug abuse. The parties were ordered to go to mediation[,] and a GAL was appointed for [C]hildren. In April, 2011, the parties reached an agreement providing for custodial time for both parties. In August, 2012, Mother reinstituted the custody action due to Father's lack of stability and recent criminal involvement. Mother was awarded "primary placement and sole custody", subject to Father's placement as agreed. Over the next several months, Orders of Court were issued steadily decreasing Father's custodial time, with an Order dated May 30, 2013 providing for Mother to have sole custody and primary placement[,] and Father's placement was "held open until such time he can establish no substance abuse issues". Father had no contact with [C]hildren after the issuance of the May 30, 2013 Order. (N.T. 05/16/16, pp. 10-15; Exhibit 1).
>
> Mother stated that she married Stepfather [in July of 2014,] and moved to Pittsburgh shortly thereafter due to

Stepfather's employment. Mother filed a Change of Address form with the United Stated Postal Service. (Exhibit 2) Father attempted to contact Mother via Facebook in mid[-]2014. Also, Father sent Mother an email on July 2, 2014 and July 11, 2014. Mother did not reply to Father's Facebook message or the first email; however, she replied to the second email and told Father he could not have contact with [C]hildren due to the May 30, 2013 Order and his involvement in criminal activity. (N.T. 05/16/16, pp. 20 -27; Exhibits 2 and 3).

Mother stated that Stepfather and [C]hildren have a wonderful, loving relationship. [C]hildren call Stepfather "Dad" and[,] as she is not employed outside the home, Stepfather is the sole financial support for the family. Father has not supported [C]hildren for several years, nor has he sent them birthday or Christmas cards or presents. (N.T. 05/16/16, pp. 30-36).

Stepfather testified that he loves [C]hildren very much, they have a great relationship, and he considers the children his sons. (N.T. 05/16/16, pp. 44-48).

Father testified that he currently lives with his sister in Milwaukee, WI. He was released from jail on March 8, 2016, after spending most of the previous three years incarcerated. He claims that he never received a copy of the May 30, 2013 Order[,] and he found out that Mother and [C]hildren were living in Pittsburgh when he received the Petition in January 2016. He admitted that he knew that Mother had resided with her [m]other in a suburb of Milwaukee and he knew her mother's address; however, he did not attempt to contact Mother through her mother. (N.T. 05/16/16, pp. 48-53, 65, 76-78).

Trial Ct. Op., 6/27/16, at 2-4.

On May 16, 2016, the trial court entered the order terminating Father's parental rights pursuant to 23 Pa.C.S. §2511(a)(1), (2), and (b). On June 15, 2016, Father filed a timely notice of appeal, along with a

concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises three issues:

I. Did the [trial] court abuse its discretion and commit an error of law when it held that the statutory grounds for involuntary termination of Father's parental rights to Children under 23 Pa.C.S.A. § 2511(a)(1) were met, thereby determining that Father, by conduct continuing for a period of at least six (6) months immediately preceding the filing of the petition either had evidenced a settled purpose of relinquishing parental claim to a child or had refused or failed to perform parental duties?

II. Did the [trial] court abuse its discretion and commit an error of law when it determined that the statutory grounds for involuntary termination of Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) were met and that the repeated and continued incapacity, abuse, neglect or refusal of Father has caused Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions and that Father could or would not remedy the causes of the incapacity, abuse, neglect or refusal?

III. Did the [trial] court abuse its discretion when it determined that terminating Father's parental rights best served the developmental, physical and emotional needs and welfare of Children?

Father's Brief at 3-4.[1]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

---

[1] We note that Father stated his issues somewhat differently in his concise statement, but we find them preserved for this Court's review.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, [ ] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [ ] 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

> Moreover, we have explained:
>
> > [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (citation omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the case *sub judice*, the trial court terminated Father's parental rights under Section 2511(a)(1), (2), and (b), which provides as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity,

> abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1)-(2), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated:

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Father alleges the facts of this case are as follows:

Shortly following [K.C.C.'s] birth, Father and Mother separated. Mother initially remained in the home with [C]hildren and Father moved out. At some point thereafter, Mother and Children moved back in with her mother in Greenfield, Wisconsin. During the time that Father and Mother resided together, Mother admits that Father parented [C]hildren as a father should. He played sports and video games with them and took them to the zoo[.] Even after Mother and Father separated, they continued to co-parent, splitting their time with [C]hildren 50/50.

Shortly after Mother and Father separated, Father's mother died. A mere six months later his father died. As a result of this unfortunate series of events, Father spiraled into a deep depression. Father was prescribed medication for panic attacks and anxiety and has been on pain medication for many years due to an amputated toe and back pain.

In 2011, Mother filed for custody of Children. Father was granted visitation which he exercised until May 2013 at which time his visitation was suspended.

In June of 2012, charges were filed against Father for stealing a bicycle and attempting to sell it. Father was charged with multiple other petty theft offenses over the next year. Father was arrested in 2013 and was incarcerated until April 2014.

In April 2014, Father was released to drug court and began a drug treatment program. Due to compliance issues, Father did not complete the program and in November 2014 the [c]ourt revoked his deferred prosecution agreement. Father maintains that his noncompliance was not drug related.

Before and during the time that Father was participating in the drug treatment program, he sent Mother text

messages and emails inquiring about [ ] Children and when he could see them. Specifically, Father sent fifteen to twenty text messages to Mother between March 2013 and July 2014 and sent her at least two emails, as well as a Facebook message. Mother responded to one of the emails, sent in July 2014, informing Father that his visitation was suspended in May 2013.

Soon thereafter, as a result of the revocation of the deferred prosecution agreement, Father was sentenced to serve prison time for the offenses for which prosecution was suspended pending completion of the drug treatment program. Father was incarcerated from late 2014 until March 8, 2016, at which time he was released.

[In July of 2014], Mother and Stepfather married[.] Shortly thereafter, Mother, Stepfather, and Children moved from Wisconsin to their current home in Pittsburgh due to Stepfather's employment. While Mother and Stepfather moved to Pittsburgh, Father remained incarcerated in Wisconsin. Mother testified that she did not notify the Wisconsin court that she was moving, nor did she file a change of address with the court. Further, Mother testified that she did not notify Father that she was moving and did not provide Father or Father's sister with a new address.

Father told the GAL that during his incarceration he called Mother multiple times and she would not accept his calls. Father also told the GAL that he did not have access to email, and was blocked by Mother on Facebook. Further, consistent with Mother's admitted lack of notification, Father testified that he was unaware until January 2016 that Mother had moved to another state and that he did not have Mother's Pittsburgh address.

Father's only means of contact while in prison was standard mail. Father enlisted the help of his sister who sent birthday and holiday cards to Mother's Wisconsin address, at which they both believed Mother to live, on behalf of Father. Father is now out of prison and though he is on probation for two years, he stated to the GAL that he would consider moving to Pittsburgh to be close to his sons.

As previously stated, Father testified that he was unaware until July 2014 that his visitation rights were suspended. Upon his release in 2016, Father took action and filed motions with the court in Wisconsin to reopen visitation. Father also filed a modification of the custody order on March 28, 2016.

Father's Brief at 5-8 (footnote and record citations omitted).

Father asserts that the evidence demonstrates that he had a loving parental relationship with Children prior to his incarcerations in 2013 and 2014. *Id.* at 8. With regard to Section 2511(a)(1), Father alleges that he neither evidenced a settled purpose to relinquish parental claim nor failed or refused to perform parental duties during the six-month period immediately preceding Mother's filing of the initial petition to involuntarily terminate parental rights. *Id.* at 8. Father contends that, during the six months immediately preceding the filing of the initial petition to involuntarily terminate his parental rights in October of 2015, he was incarcerated, and, thus, unable to visit with or provide financial support for Children. *Id.* at 8, 10-11. Father cites *In re Adoption of S.P.* and *In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975), in support of his contention that incarceration alone is not a sufficient basis to terminate parental rights. Father's Brief at 10.

Father also cites *In re R.I.S.*, 36 A.3d 567, 571 (Pa. 2011), for the proposition that a parent's absence or failure to support his child due to incarceration is not, in itself, conclusively determinative of the issue of

parental abandonment for the purpose of terminating parental rights. Father's Brief at 10-11. Father urges that he did as much as he possibly could have done to maintain a place of importance in Children's lives during his incarceration from late 2014 to March of 2016. *Id.* Specifically, Father claims that he called, sent emails, and sent text messages to Mother inquiring about Children's well-being, and asking when he could see them. *Id.* at 11-12. Father states that he sent fifteen to twenty text messages to Mother between March of 2013 and July of 2014, at least two emails, and a Facebook message. *Id.* at 12. Father claims that, until Mother sent him a responsive email in July of 2014, she failed to timely notify him of the suspension of his visitation in May of 2013. *Id.* Father claims that, shortly thereafter, he was incarcerated, and his ability to act regarding the suspension of his visitation was seriously curtailed. *Id.* Father states that, although he exercised reasonable firmness in endeavoring to overcome the obstacles imposed by Mother, the barriers were insurmountable. *Id.*

Moreover, with regard to section 2511(a)(2), Father asserts that he has not evidenced the repeated and continued incapacity, abuse, neglect or refusal that has caused Children to be without essential parental care, control or subsistence necessary for their well-being, and, to the extent that his incarceration caused such incapacity, that cause has been remedied. *Id.* at 8. Father states that he did not become incarcerated until C.T.C. was nine years old, and K.C.C. was six years old, and that he was involved in

their lives and performed parental duties prior to his incarceration. *Id.* at 13. Father claims that, after his incarceration, he performed parental duties by having his sister send cards and letters to Children on his behalf. *Id.* Father states that he has been committed to fighting for his parental rights since his released from prison in March of 2016. *Id.* Father urges that his temporary incapacities due to alleged pain medication abuse and incarceration have been remedied, and that he is ready, able, and willing to parent Children. *Id.*

In its opinion, the trial court provided the following analysis of Section 2511(a)(1) and (2).

> Here, Father simply "failed to perform his parental duties" after May 30, 2013, if not before that date. By his own admission, Father did not attempt to contact Mother until July 2014 and his attempts were feeble, at best (i.e., a Facebook contact and two emails). Father did not file a Petition with the Court in Milwaukee County seeking visitation or custody of [C]hildren[,] and Father did not bother to send [C]hildren birthday or Christmas cards or gifts. Moreover, even when he was not incarcerated, Father made no attempt to financially support [C]hildren. Rather, Father stood by and put the burden of supporting two growing boys solely on Mother's shoulders. Fortunately, Mother dated and married a man that was willing to love and support [C]hildren. Accordingly, this [c]ourt affirms its finding that Mother proffered clear and convincing evidence with regard to both subsection (a)(1) and subsection (a)(2).

Trial Ct. Op. at 5.

In **In re Adoption of S.P.**, our Supreme Court reiterated the standard with which a parent must comply in order to avoid a finding that he abandoned his child.

> Applying in **McCray** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [**McCray**] at 655.
>
> * * *
>
> Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

**In re Adoption of S.P.**, 47 A.3d at 828 (quoting **In re Adoption of McCray**, 331 A.2d at 655) (footnotes and internal quotation marks omitted).

Also in **In re Adoption of S.P.**, our Supreme Court re-visited its decision in **In re R.I.S.** and stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). **See e.g. Adoption of J.J.**, 515 A.2d at 891 ("A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [**In re**] **E.A.P.**, 944 A.2d [79,] 85 [(Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and

- 13 -

which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re Adoption of S.P.*, 47 A.3d at 830–831.

As the Supreme Court definitively ruled in *In re Adoption of S.P.*, the trial court may examine the effect of a parent's incarceration in ruling on a termination petition. Herein, the trial court appropriately considered Father's incarceration in addressing the evidence offered to support the termination of Father's parental rights under section 2511(a)(1). The trial court determined that Father failed to perform his parental duties for the requisite six-month period. The trial court noted that Father's explanation for his failure to perform his parental duties and for his post-abandonment conduct was his incarceration. The trial court rejected, as insufficient, Father's two emails and a Facebook contact, noting they did not amount to the performance of his parental duties.

This Court has instructed:

It is incumbent upon a parent when separated from his child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life.

- 14 -

*In re G.P.−R.*, 851 A.2d 967, 976 (Pa. Super. 2004).

After our careful review of the trial court's application of the law to the facts of this case, we discern no reason to disturb its determination that Father failed to perform his parental duties with regard to Children, and that his explanations for his lack of contact were incredible. We conclude that the trial court's determinations regarding section 2511(a)(1) are supported by ample, competent evidence in the record. *See In re Adoption of S.P.*, 47 A.3d at 826−827.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

Our Supreme Court set forth our inquiry under section 2511(a)(2) as follows:

> [Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . . .
>
> This Court has addressed incapacity sufficient for termination under 23 Pa.C.S.A. § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) (quoting *In re William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

A parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d at 340. "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

Moreover,

> incarceration is a factor, and [it] indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to

incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 47 A.3d at 828.

Pursuant to our Supreme Court's pronouncement in *In re Adoption of S.P.*, the trial court properly considered the history of the case, including Father's incarceration, and his lack of contact with Children. After a careful review of the record in this matter, we find the record supports the trial court's factual findings, and the court's conclusions are not the result of an error of law or an abuse of discretion. *Id.* at 826-27. We find no abuse of discretion in the trial court's termination of Father's parental rights to Children pursuant to section 2511(a)(2).

Since we conclude that the requirements of 23 Pa.C.S. § 2511(a)(1) and (2) were satisfied, we proceed to review whether the requirements of subsection (b) were met. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). We have stated that the focus in terminating parental rights under 23 Pa.C.S. § 2511(a) is on the parent, but, under subsection (b), the focus is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs

- 17 -

and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

With regard to section 2511(b), the trial court provided the following analysis:

> Having determined that Father's conduct warranted termination, the Court then turned to the issue of whether termination served the emotional needs and welfare of the children. The testimony at the hearing established without a doubt that the children's best interests would be served by terminating Father's parental rights and permitting the adoption by Stepfather to proceed. The children and Stepfather have a very strong parent-child bond, which, as a result of Father's actions, no longer exists between Father and the children. In addition, even though the children are not his "legal" sons, the Stepfather treats them as sons by supporting them developmentally, emotionally, and financially. As such, the second prong of the statute has been satisfied.

Trial Ct. Op. at 5-6.

Father argues that the record does not support a finding that the needs and welfare of Children are best met by terminating his parental rights, in the absence of an expert assessment of the bond between Father and Children. He requests this Court remand the case for the appointment of a psychologist to assess the parental bond for consideration as part of the

needs and welfare analysis under section 2511(b). Father's Brief at 8. Father asserts that such a bond existed prior to his incarceration and the obstacles that Mother consequently imposed during his incarceration. *Id.* at 14. He contends that it was improper for the trial court to sever that bond without a consideration of the impact of severing the bond on Children. *Id.*

When evaluating a parental bond,

> the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P.*, 994 A.2d at 1121 (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary . . . ." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

This Court has stated that a parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The

psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763-764 (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

This Court has stated: "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d at 856 (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

After a careful review of the record in this matter, we find the record supports the trial court's factual findings, and the court's conclusions are not

the result of an error of law or an abuse of discretion with regard to Section 2511(b). *In re Adoption of S.P.*, 47 A.3d at 826-27. Accordingly, it was proper for the trial court to find no bond exists such that Children would suffer permanent emotional harm if Father's parental rights were terminated.

We, therefore, affirm the order terminating Father's parental rights with regard to Children under Section 2511(1), (2), and (b).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/14/2016